United States District Court
Southern District of Texas
**ENTERED**
March 24, 2017
David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| JACQUELINE ELAINE NICKERSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 4:15-cv-02727 |
| | § | |
| NANCY BERRYHILL, ACTING | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER ON
MOTIONS FOR SUMMARY JUDGMENT**

On March 23, 2016, the parties consented to proceed before a United States magistrate judge for all purposes, including the entry of a final judgment under 28 U.S.C. § 636(c). (Docket Entry #13). The case was then transferred to this court. Cross-motions for summary judgment have been filed by Plaintiff Jacqueline Nickerson ("Plaintiff," "Nickerson") and Nancy Berryhill ("Defendant," "Commissioner"), in her capacity as Acting Commissioner of the Social Security Administration ("SSA"). (Plaintiff's Motion for Summary Judgment ["Plaintiff's Motion"], Docket Entry #22; Defendant's Motion for Summary Judgment and Memorandum in Support of Defendant's Cross-Motion for Summary Judgment ["Defendant's Motion"], Docket Entry #19). In addition, Defendant filed a reply. (Defendant's Response in Opposition to Plaintiff's Motion for Summary Judgment ["Defendant's Response"], Docket Entry #23). After considering the pleadings, the evidence submitted, and the applicable law, the court ORDERS Defendant's motion **GRANTED**, and Plaintiff's motion **DENIED**.

***Background***

On June 5, 2012, Plaintiff Jacqueline Nickerson filed an application for Supplemental Security Income benefits ("SSI"), under Title XVI of the Social Security Act ("the Act"). (Transcript ["Tr."] at 121). In her application for benefits, Nickerson claimed that she has been unable to work since May 6, 2011, because she has bipolar disorder,[1] schizophrenia,[2] diabetes, high blood pressure, accompanied by headaches, back pain, and ovarian cysts. (*See* Tr. at 141). She concedes, however, that her previous temporary employment ended on January 15, 2009. (Tr. at 141). On October 3, 2012, the SSA found that Nickerson was not disabled under the Act, and so her application was denied. (Tr. at 57-58). Plaintiff petitioned for a reconsideration of that decision, but her claim was again denied on January 25, 2013. (Tr. at 65-67, 60). She then successfully requested a hearing before an administrative law judge ("ALJ"). (Tr. at 71-75). That hearing took place on November 25, 2013, before ALJ Mark Dowd. (Tr. at 28). Plaintiff testified at the hearing and was assisted by an attorney, Hubert Lassiter. (Tr. at 28-47). Sheryl Lynn Swisher, a vocational expert witness, testified as well at the hearing. (Tr. at 47-52). No medical experts testified at the hearing.

On March 11, 2014, the ALJ engaged in the following five-step, sequential analysis to determine whether Plaintiff was capable of performing substantial gainful activity or was, in fact, disabled:

    1.      An individual who is working or engaging in substantial gainful activity will

---

[1] Bipolar disorder is a major mental disorder characterized by episodes of mania, depression, or mixed mood. Mosby's Medical, Nursing, & Allied Health Dictionary 196 (5th ed. 1998)

[2] Schizophrenia is a pshychotic disorder characterized by gross distortions of reality, withdrawal from social interaction, disturbance of language and communication, and fragmentation of thought, perception, and emotional reaction. Mosby's at 1456.

not be found disabled regardless of the medical findings. 20 C.F.R. §§ 404.1520(b) and 416.920(b).

2.     An individual who does not have a "severe impairment" will not be found to be disabled. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

3.     An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors. 20 C.F.R. §§ 404.1520(d) and 416.920(d).

4.     If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

5.     If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed. 20 C.F.R. §§ 404.1520(g) and 416.920(g).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *Martinez v. Chater*, 64 F.3d 172, 173-74 (5th Cir. 1995); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991); *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988). It is well-settled that, under this analysis, Nickerson has the burden to prove any disability that is relevant to the first four steps. *Wren*, 925 F.2d at 125. If she is successful, the burden then shifts to the Commissioner, at step five, to show that she is able to perform other work that exists in the national economy. *Myers v. Apfel,* 238 F.3d 617, 619 (5th Cir. 2001); *Wren*, 925 F.2d at 125. "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

It must be emphasized that the mere presence of an impairment does not necessarily establish a disability. *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)). Under the Act, a claimant is deemed disabled only if she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically

3

determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing 42 U.S.C. § 423(d)(1)(A)). Substantial gainful activity is defined as "work activity involving significant physical or mental abilities for pay or profit." *Newton*, 209 F.3d at 452. A physical or mental impairment is "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (citing 42 U.S.C. § 423(d)(3)). Further, the impairment must be so severe as to limit the claimant so that "she is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any kind of substantial gainful work which exists in the national economy." *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citing 42 U.S.C. § 423(d)(2)(A)).

Based on these principles, as well as his review of the evidence presented at the hearing, the ALJ found that Plaintiff "has not engaged in substantial gainful activity since June 5, 2012, the application date." (Tr. at 11). The ALJ further concluded that Nickerson suffers from the severe impairments of low back pain, obesity, a major depressive disorder, and polysubstance abuse. (*Id.*). The ALJ found that Plaintiff also suffers from diabetes and hypertension, but that those conditions are not severe, because each is controlled by medication. (*Id.*). He considered Plaintiff's complaint of left leg numbness, and tingling and decided that these are not severe impairments, because they are recent complaints, and are not expected to persist for 12 months, and are not supported by any clinical or diagnostic evidence. The ALJ further found that Plaintiff's impairments do not meet, or equal in severity, the medical criteria for any disabling impairment in the applicable SSA

regulations.[3] (*Id.*).   The ALJ then assessed Plaintiff's residual functional capacity ("RFC"), and found that she is capable of performing light work,[4] but is limited to simple, routine and repetitive 1-2-3 step tasks that do not require fast-paced production.  (Tr. at 14-15).  Nickerson is also limited to only occasional interaction with the public and co-workers, and she needs a supervisor to check her work four times a day.  (Tr. at 15).  With these limitations, the ALJ found that Nickerson is able to work as an office cleaner, a mail clerk, and a housekeeper.  (Tr. at 18).  For that reason, he concluded that Nickerson is "not [] under a disability, as defined in the Social Security Act," and he denied the application for benefits on March 11, 2014. (Tr. at 47-48).

On May 8, 2014, Plaintiff requested an Appeals Council review of the ALJ's decision.  (Tr. at 5).  SSA regulations provide that the Appeals Council will grant a request for a review if any of the following circumstances is present: "(1) there is an apparent abuse of discretion by the ALJ; (2) an error of law has been made; (3) the ALJ's actions, findings, or conclusions are not supported by substantial evidence; or (4) there is a broad policy issue which may affect the public interest." 20 C.F.R. §§ 404.970 and 416.1470.  On August 21, 2014, the Appeals Council denied Plaintiff's request for a remand, finding that no applicable reason for review existed.  (Tr. at 1-3). With this ruling, the ALJ's decision became final. *See* 20 C.F.R. §§ 404.984(b)(2) and 416.1484(b)(2).

On September 16, 2015, Plaintiff filed this lawsuit, pursuant to section 205(g) of the Act

---

[3] A claimant is presumed to be "disabled" if her impairments meet, or equal in severity, a condition that is listed in the appendix to the Social Security regulations. *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994).

[4] "Light work" involves lifting no more than twenty pounds, occasionally, with the ability to lift or carry items weighing up to ten pounds frequently. Although the weight lifted may be very little, a job is designated as "light" if it requires a good deal of walking or standing, or if it involves sitting a majority of the time, with some pushing and pulling of arm or leg controls. To be considered capable of performing a full range of light work, an individual must be able to perform substantially all of the activities listed. An individual must also be capable of performing sedentary work, unless there are additional limiting factors, such as the loss of manual dexterity, or the inability to sit for long periods. 20 C.F.R. §§404.1567(a),(b).

(codified as amended at 42 U.S.C. § 405(g)), to challenge that decision. (Complaint, Docket Entry #1). The parties have filed cross-motions for summary judgment. (Docket Entries 19, 22). Having considered the pleadings, the evidence submitted, and the applicable law, Plaintiff's motion for summary judgment is denied, and Defendant's motion for summary judgment is granted.

### Standard of Review

Federal courts review the Commissioner's denial of disability benefits only to ascertain whether the final decision is supported by substantial evidence and whether the proper legal standards were applied. *Newton*, 209 F.3d at 452 (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)). "If the Commissioner's findings are supported by substantial evidence, they must be affirmed." *Id.* (citing *Martinez*, 64 F.3d at 173). "Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. It is more than a mere scintilla and less than a preponderance." *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see Martinez*, 64 F.3d at 173 (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990)). On review, the court does not "reweigh the evidence, but . . . only scrutinize[s] the record to determine whether it contains substantial evidence to support the Commissioner's decision." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *see Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987). If no credible evidentiary choices or medical findings exist that support the Commissioner's decision, then a finding of no substantial evidence is proper. *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988).

### Discussion

Before this court, Nickerson contends that the ALJ applied the wrong legal standard in weighing the credibility of her subjective complaints. (Plaintiff's Motion at 11, 18). Plaintiff insists that this error then caused the ALJ to overlook the overwhelming evidence that she is disabled.

6

(Plaintiff's Motion at 12-18).  Because of that error, she complains that the Commissioner's findings are not supported by substantial evidence.  (*Id.*).  Defendant insists, however, that the ALJ properly considered all of the available evidence, and followed the applicable law, in determining that Nickerson is not disabled. (Defendant's Motion at 4).

### *Medical Facts, Opinions, and Diagnoses*

On December 19, 2010, the Houston Police Department was called to Plaintiff's home to intervene in an altercation between Nickerson and her stepfather.  (Tr. at 204).  The police found her aggressive and disruptive, and so Plaintiff was taken to the NeuroPsychiatric Center, the emergency treatment center for the Harris Center for Mental Health and IDD ("HCMH").[5]  (Tr. at 204).  She was verbally aggressive, loud, profane, and difficult to understand, so she was then transferred to the Harris County Psychiatric Center ("HCPC") on an involuntary admission.  (Tr. at 211).  That admission was due to her expressed desire to commit assault, and her exhibited deterioration in her ability to function.  (Tr. at 209).  The medical records show that Nickerson had been previously hospitalized at HCPC, in 2005, for an alcohol induced mood disorder, and on one other occasion for treatment of schizoaffective[6] (bipolar type) disorder.  (Tr. at 204).   In addition to the prior hospitalizations, Plaintiff reported a suicide attempt at age 20, in which she drank a bottle of Nyquil. (*Id.*).

Although the 2010 hospitalization was involuntary, Plaintiff was calm and cooperative during her initial examination.  (*Id.*).  She told Dr. Ashley Toutounchi, a psychiatrist, that she was

---

[5]  At the time of Plaintiff's treatment, The Harris Center for Mental Health and IDD was known as the Mental Health and Mental Retardation Authority of Harris County.  The current name is used throughout this opinion.

[6]  Schizoaffective disorder includes characteristics of schizophrenia and a mood disorder, but does not meet the criteria for either diagnosis. MOSBY'S at 1456.

irritable and needed assistance to control her anger. (*Id.*). She reported feeling depressed, with episodes of crying for no reason. (*Id.*). Overall, however, she described only minor symptoms such as irritability, "a little" depression, and an inability to control her anger. She denied hallucinations, memory or concentration problems, or feelings of hopelessness or worthlessness. (*Id.*). Plaintiff told Dr. Toutounchi that she had never taken psychiatric medication and was not currently receiving any psychiatric treatment. (*Id.*).

Nickerson described heavy alcohol use on weekends, and told the doctor that she drinks more than two six packs of beer each day. (*Id.*). She also admitted to marijuana use during the months that led up to her hospitalization, a habit that began when she was a teenager. (*Id.*). Dr. Toutounchi's psychiatric evaluation showed that Plaintiff had a concrete thought process with no delusions or suicidal thoughts, but that her insight and judgment were poor. (Tr. at 206). Nickerson reported moderate to severe anxiety, moderate tension and hostility, and moderate excitement. (Tr. at 209-210). Plaintiff was diagnosed as suffering from an unspecified mood disorder, and alcohol and marijuana abuse. (Tr. at 208).

Plaintiff was hospitalized for three days, and was discharged on December 22, 2010. (Tr. at 211). During her hospitalization, she tested positive for marijuana and cocaine metabolites. (Tr. at 212). She was prescribed Risperdal, an anti-psychotic medication, which is used to treat schizophrenia and bipolar disorder. She also participated in some group therapy sessions while at the hospital. (Tr. at 213). Plaintiff initially blamed the events leading to her hospitalization on her mother and step-father, but eventually revealed that she has heard voices, intermittently, since she was sixteen years old. She reported that these voices cause her distress. (Tr. at 213). Her condition

improved almost immediately when she began taking the Risperdal. (*Id.*). She was given a GAF[7] score of 30, at the time of her admission. That score was increased to 45 at the time of her discharge. (Tr. at 213). On discharge, Dr. Tounoutchi was unsure if Plaintiff should be diagnosed as suffering from schizophrenia, or whether she had a mood spectrum disorder. (Tr. at 213). Plaintiff was advised to schedule an appointment at the Community Clinic for further psychiatric treatment, and she was encouraged to begin drug and alcohol rehabilitation. (Tr. at 214-215). Nickerson was much improved when she was released from the hospital, but she was told that she was in need of substance abuse treatment. (Tr. at 218, 216).

On May 6, 2011, Plaintiff sought treatment at the Psychiatric Emergency Services center of HCMH. (Tr. at 229). Plaintiff acknowledged that this was her first treatment since leaving the psychiatric hospital five months earlier. (Tr. at 229). She had run out of medication and wanted to take Risperdal again, because it had helped with her symptoms. She did not want to be hospitalized, however. (Tr. at 229, 337). She admitted to heavy alcohol use in the months before this visit. (Tr. at 229). Plaintiff also believed marijuana helped to calm her, and she continued to use it. (*Id.*). Plaintiff said that she had tried to kill herself three weeks earlier, because she was upset with a friend. However, she had stopped herself, and no was no longer contemplating suicide. (Tr. at 229). She complained that she heard voices telling her to look at herself in the mirror, and she claimed to see shadows of people who spoke to her. (Tr. at 337).

---

[7] The GAF scale is used to rate an individual's "overall psychological functioning." AMERICAN PSYCHIATRIC INSTITUTE, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV") 32 (4th ed. 1994). The scale ascribes a numeric range from "1" ("persistent danger of severely hurting self or others") to "100" ("superior functioning") as a way of categorizing a patient's emotional status. *See id.* A GAF score of 21-30 indicates that the person has a serious impairment in communication or judgment, or their behavior is influenced by delusions or hallucinations. (*Id.*). A GAF score between 41-50 "reflects serious symptoms" or "any serious impairment in social, occupational, or school functioning." *Id.* A GAF score of 51-60 indicates "[m]oderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers)." *Id.*

Dr. Charles Kopecky examined Plaintiff during this visit, and found her well dressed, and neatly groomed.  (Tr. at 230-231).  Her thought process was logical and clear, and she had fair insight and judgment.  (Tr. at 231).  She denied delusions, but did express a belief that she would be better off dead, and said that she felt helpless and hopeless.  (Tr. at 231, 337).  Dr. Kopecky described her as depressed and subject to mood changes.  (Tr. at 230-231).  He was uncertain if Plaintiff was suffering from a major depressive disorder, or if she had bipolar disorder.  (Tr. at 232).  He gave her a GAF score of 39.  (Tr. at 232).   He prescribed Risperdal, Celexa and Trazodone to treat her depression.  (Tr. at 231).  She was asked if she wanted to check in to the crisis stabilization unit voluntarily, and she declined to do so.  (Tr. at 231).  She was then referred to the mobile crisis outreach team, and told to schedule an appointment for additional treatment.  (Tr. at 232).

Over the following three weeks, the outreach team contacted Plaintiff on several occasions to encourage her to continue her psychiatric treatment.  (Tr. at 323-325).  Nickerson missed several appointments at HCMH, and did not follow advice to see a doctor for her overall health care.  (Tr. at 221).  When she was finally contacted at her home, Plaintiff explained that she was doing much better on the medications, that her hallucinations were greatly reduced, and that she no longer wanted to die.  (Tr. at 325-326, 224).  On June 14, 2012, Nickerson was discharged from the mental health program because she was not participating in the treatment.  (Tr. at 221).

On August 4, 2013, Nickerson was examined by Christina Gamez-Galka, Ph.D., a psychologist acting on behalf of the state.  (Tr. at 264).  Plaintiff was accompanied by her mother, and both women were asked to describe Nickerson's history of psychiatric problems.  (Tr. at 264).  Dr. Gamez-Galka believed that Plaintiff was a poor and unreliable historian, because her statements and explanations of symptoms were inconsistent and contradictory.  (Tr. at 264-265).  Plaintiff told

Dr. Gamez-Galka that she has heard voices and experienced hallucinations since she was fourteen years old. (Tr. at 265). She said that the voices alternate between positive and negative statements. Sometimes the voices tell her she is beautiful, while at other times the voices tell her to hurt herself. (*Id.*). Plaintiff explained that the voices occur more often when she is alone, and that they last for several hours. (*Id.*). She also told Dr. Gamez-Galka that there are times when she awakens and thinks she sees someone standing at the end of her bed. (*Id.*). This happens at least once a month, and sometimes happens even when she is fully awake. (*Id.*).

Dr. Gamez-Galka detailed several instances of irrational behavior by Plaintiff. (*Id.*). Nickerson's mother said that Plaintiff will walk to her aunt's house, a significant distance, for no reason. (*Id.*). Plaintiff will talk for hours nonstop. At other times, she will cook all of the food in the house. (*Id.*). Plaintiff explained that she feels as if her mood is constantly changing between happy and sad, and she is restless, with difficulty in concentrating. (*Id.*).

Dr. Gamez-Galka questioned Plaintiff's reliability, in part, because she was not able to remember specific details about her past treatment. (*Id.*). Nickerson brought a copy of the court order for her December 2010 commitment, but neither she nor her mother could remember what led to the hospitalization. (*Id.*). Plaintiff also told Dr. Gamez-Galka that she had been hospitalized at Ben Taub Hospital, then transferred to a facility in Montgomery County, in 2011. (*Id.*). Nickerson's mother was unsure whether such a hospitalization had, in fact, occurred, and it is not mentioned in any other record. (*Id.*). Plaintiff also said that she had attempted suicide on more than ten occasions. She said that she had tried to kill herself, at age fourteen, by hanging, but that the rope fell down. (*Id.*). She then tried to cut herself but was interrupted by her sister. (*Id.*). Her mother was unaware of either of those attempts. (*Id.*). Nickerson had also attempted to kill herself by

taking pills with alcohol and NyQuil, and said that at least one attempt lead to a hospital admission. (*Id.*).  She told Dr. Gamez-Galka that she had recently thought about hurting herself, but she called her daughter for support.  (Tr. at 266).

Plaintiff told Dr. Gamez-Galka that she had stopped drinking a year ago, but had used marijuana within the last two months.  (Tr. at 267).  She said that she had last worked in the 1990's, but had stopped, because she worried about how her co-workers would respond to her criminal history and substance addictions.  (Tr. at 264, 266).  Dr. Gamez-Galka reported that Plaintiff's thoughts were coherent and logical, but her memory was very poor, and she was unable to do basic math.  (Tr. at 266-267).  Dr. Gamez-Galka did not provide a diagnosis for Plaintiff, because she found Nickerson's statements too unreliable, and the reported symptoms and clinical observations were not consistent enough to support a conclusive diagnosis.  (Tr. at 268).  Plaintiff's prognosis was said to be  "guarded," because of her inconsistent use of medication and the absence of treatment that would help her cope with her symptoms.  (*Id.*).  Plaintiff was given a GAF score of 41.  (*Id.*).  Although Nickerson understood what it meant to file a claim for Social Security benefits, Dr. Gamez-Galka did not believe she could manage benefits on her own, because she was not consistent in taking medication and was still using drugs.  (*Id.*).

Five days after the psychiatric examination by Dr. Gamez-Galka, Plaintiff returned to the NeuroPsychiatric Center ("NPC") to be voluntarily admitted.  (Tr. at 275-276).  She was struggling with suicidal thoughts and asked to be hospitalized.  (Tr. at 280).  Although Plaintiff had told Dr. Gamez-Galka a week earlier that she was taking her medications, she told the nurse at NPC that she had been without medication for two months.  (Tr. at 405).  Plaintiff was transferred to the Crisis Stabilization Unit for admission.  (Tr. at 290).  She  told the nurse that she was depressed and seeing

shadows.  (Tr. at 290).  She admitted to using alcohol and marijuana the day before.  (Tr. at 284).  She complained of abdominal pain, lower back pain, and leg pain, and she was found to have high blood sugar levels.  (Tr. at 290, 300).

During this hospitalization, Plaintiff resumed anti-depressant and anti-psychotic medications, and attended group therapy sessions led by the NPC staff.  (Tr. at 317- 321).  During these sessions, Nickerson set goals to be more positive and healthy, to continue to take her medications, and to show respect for herself and others.  (Tr. at 317, 320-321).  Although the drugs were effective in treating her depression, Nickerson complained of a number of side effects, including headaches, vision changes, drowsiness, rashes, nausea, anxiety, nervousness, lightheadedness upon standing, and impaired concentration.  (Tr. at 315).  Nickerson complained of these side effects in the group sessions, but her medical care providers recorded no such complaints to them during her hospitalization.  (Tr. at 315, 278).

Plaintiff was discharged from the Crisis Stabilization Unit, on August 15, 2012, six days after admission.  (Tr. at 299).  At that time, she was diagnosed as suffering from a major depressive disorder with psychotic features.  (Tr. 299).  Nickerson was told to continue taking her medications, and to continue psychiatric treatment through HCMH.  (Tr. at 299).   An outpatient drug test was positive for marijuana on August 22, 2012.  (Tr. at 429).

Three weeks later, on September 4, 2012, she returned to the Harris County Psychiatric Center for treatment and was seen by Shakeel Raza, M.D., a psychiatrist.  (Tr. at 398).  Plaintiff said that she had experienced no hallucinations since her last treatment.  (Tr. at 398).  She was counseled to continue taking her medications, and to continue her outpatient treatment.  (Tr. at 428).  Plaintiff agreed to discontinue drug and alcohol use, and to attend Alcohol and Narcotics Anonymous

meetings.  (Tr. at 430).  Dr.  Raza, confirmed that Plaintiff was suffering from a major depressive disorder with psychotic features, and that she also had an intermittent explosive disorder, and unexplained academic problems.[8]  (Tr. at 424).  Dr. Raza gave Nickerson a GAF score of 55. Plaintiff then met with Gerald Hanson, a qualified mental health professional, as part of her outpatient psychiatric treatment through the Northwest Community Services Center ("NWCSC"). (Tr. at 465).  Plaintiff discussed with Mr. Hanson strategies for identifying and communicating her symptoms to her medical and mental health care providers.  (Tr. at 465).  She was encouraged to record her symptoms, and to seek emergency assistance if she thought about suicide.  (Tr. at 465).

On September 9, 2012, Nickerson was examined by Paul Dibble, M.D., a family doctor acting on behalf of the state, to assess her complaints of back pain, diabetes, hypertension, headaches, and ovarian cysts.  (Tr. at 362).  Plaintiff told Dr. Dibble that her low back pain began when she was pregnant with her daughter twenty three years earlier.  (Tr. at 362).  She complained of almost constant pain, which she rated at a "10," on a scale of 1 to 10.  (Tr. at 362).  She told Dr. Dibble that the pain radiates down her legs to both ankles, and causes her to take frequent breaks while doing household chores.  (Tr. at 363).  She said that her legs occasionally "give out," and she has fallen as a result.  She does not use any assistive device to help her walk.  (Tr. at 363).  Over the counter medications like aspirin and Advil provide little relief from this pain.  (Tr. at 363).  A physical examination showed that Plaintiff did not have a full range of motion in her knees and hips. (Tr. at 364).  Dr. Dibble attributed the diminished range of motion to her obesity.  (Tr. at 364).  He found no deformities or tenderness in any area of Plaintiff's back, and she was able to walk

---

[8]  Nickerson explained that she had dropped out of high school in the eleventh grade because of "drug and alcohol abuse."  (Tr. at 419).  There is no other explanation for this statement by Dr. Raza.

normally, without assistance.  (Tr. at 364).

Dr. Dibble briefly discussed Plaintiff's diabetes and hypertension, stating that she has received no treatment and taken no medication since those conditions were diagnosed in 2011.  (Tr. at 363).  She told Dr. Dibble that she suffers headaches every couple of days and that these can last from an hour to all day.  (Tr. at 363).  She also told him that ovarian cysts were discovered in May 2012, and that they cause constant pain in her lower abdomen.  (Tr. at 363).  Finally, she complained of poor vision, but admitted that she can read and watch television.  (Tr. at 363).  During the examination, Dr. Dibble found that she could read from a small calendar without trouble, even though she scored poorly on the eye exam.  (Tr. at 364).  She told Dr. Dibble that she had not consumed any alcohol or marijuana in over a month.  (Tr. at 364).

Dr. Dibble discussed the effect of each of these conditions on Nickerson.  (Tr. at 365).  He said that, subjectively, her back pain limited her ability to stand or walk for long periods.  Although she said that her back caused her almost constant pain, there was no objective evidence to show that her mobility was impaired.  (Tr. at 365).  He did order an X-ray of her lower spine, but he completed his report before the results were available to him.[9]  (Tr. at 365).  Dr. Dibble did not find any impairments due to Plaintiff's diabetes or hypertension, because there were no complications or evidence of organ damage.  (Tr. at 365).  Dr. Dibble concluded that Plaintiff's subjective pain from headaches and her ovarian cysts, if severe, could affect her ability to function, but that those conditions do not directly impact an ability to work.  (Tr. at 365).  He offered no opinion on whether Nickerson has a visual impairment, because he found the results from her eye examinations to be

---

[9]  The X-ray, however, does show a grade 1 anterolisthesis of the L-4/L-5 vertebra, with some evidence of spinal damage.  (Tr. at 367).  Anterolisthesis occurs when one spinal vertebra slips forward onto the vertebra below it.  *See, generally,* MOSBY'S at 1528.  It can cause back and leg pain.  The amount of slippage is graded on a scale of one to four, with four being the most severe.

inconsistent.  (Tr. at 365).

Nickerson continued her outpatient treatment with NWCSC on September 11, 2012.  (Tr. at 464).  On that date, she met with Mary Vallesteros.  (Tr. at 364).  Ms. Vallesteros counseled her on the importance of taking her medications, as well as the possible side effects from those drugs.  (Tr. at 464).  They discussed the symptoms of depression, and developed a crisis plan should Plaintiff begin to think about suicide.  (Tr. at 464).  Ms. Vallesteros expressed concern that Nickerson was not showing any progress in her treatment.  (Tr. at 464).  Ms. Vallesteros  helped Plaintiff to apply for health insurance so that she could be seen by a family physician.  (Tr. at 463).

Ms. Vallesteros next met with Plaintiff two weeks later, on September 20, 2012.  (Tr. at 462).  Nickerson was reminded to take her medications as prescribed.  (Tr. at 462).  Plaintiff complained to Ms. Vallesteros that the  medications made her drowsy, stiff, and gave her tremors, although they did improve her mood.  (Tr. at 462).  She said that she had suffered no hallucinations between sessions.  Ms. Vallesteros believed that Plaintiff was now showing progress, because she was able to recognize and explain the benefits of taking her medication.  (Tr. at 462).  When Plaintiff met with Ms. Vallesteros on October 9, 2012, they discussed ways to prevent relapses and repeated hospitalizations.  (Tr. at 461).  On that day, Plaintiff reported that she was still experiencing hallucinations in which she saw and heard her deceased boyfriend.  However, she said that she was taking her medicines daily and her symptoms were improving.  (Tr. at 461).

On October 15, 2012, Plaintiff returned to Ms. Vallesteros, complaining that she was "feeling down" and not interested in any activities.  (Tr. at 460).  She occasionally thought about suicide, but made no plans to do so.  (Tr. at 460).  She said that she saw her deceased boyfriend sitting next to her at church and that it frightened her, but that she has gotten used to these sights.  (Tr. at 460).

16

On October 15, 2012, Cate Miller, M.D., a psychiatrist acting on behalf of the state, reviewed Nickerson's medical records and completed a Psychiatric Review Technique Form which documented her opinions on Plaintiff's mental status, from May 6, 2012,[10] to October 3, 2012.  (Tr. at 371).  Dr. Miller reported Plaintiff as having a "history at [HCMH] of showing up in crisis then not appearing for any [follow up]."  (Tr. at 383).  Dr. Miller found Nickerson to have a major depressive disorder with psychosis, a substance addiction disorder, and nonmental impairments.  (Tr. at 371).  However, she found that Nickerson's depressive disorder did not satisfy the diagnostic criteria of SSA Listing 12.04, because she did not have "marked" functional limitations.  (Tr. at 381)  According to Dr. Miller,[11] Plaintiff had experienced no episodes of decompensation.  (Tr. at 381).  For that reason, Plaintiff did not meet the criteria to satisfy the SSA Listing for an affective disorder.  (Tr. at 382).   Further, Plaintiff's impairment from alcohol, cocaine, and cannabis abuse did not satisfy the diagnostic criteria, set out in SSA Listing 12.09, so that she is not disabled as a matter of law.  (Tr. at 379).  Dr. Miller found Nickerson to have moderate limitations in "maintaining social functioning" and "maintaining concentration, persistence, or pace," as well as mild limitations in her activities of daily life.  (Tr. at 381).  Dr. Miller agreed that Plaintiff may have some limitations because of her psychological symptoms, but they did not "wholly compromise [Plaintiff's] ability to function . . . on a sustained basis."  (Tr. at 383).

Dr. Miller also completed a Mental Residual Functional Capacity Assessment on Plaintiff. (Tr. at 393).    Dr. Miller found "marked limitations" in Plaintiff's ability to understand, remember,

---

[10]  Dr. Miller does not explain why she selected this as a starting date.  It may be a typographical error, as Plaintiff alleges her disability began on May 6, 2011.

[11]  Dr. Miller did not explain why the August 2012 hospitalization was not deemed an episode of decompensation.

17

and carry out detailed instructions. (Tr. at 393). She also found Nickerson to have moderate limitations in numerous areas. She was limited in her ability to concentrate for extended periods of time, as well as in her ability to complete a normal workday without interruptions from psychologically based symptoms. (Tr. at 394). She was moderately limited in her ability to work at a consistent pace. (Tr. at 394). She was also limited in her ability to work in coordination with others without being distracted by them; to accept instructions and respond appropriately; and to get along with coworkers. (Tr. at 393). Her abilities to respond appropriately to changes in the workplace, and to set realistic goals were moderately limited, as well. (Tr. at 394). Dr. Miller believed that Plaintiff was able to "understand, remember and carry out only simple instructions, to make simple decisions, to attend and concentrate for extended periods, to interact adequately with co-workers and supervisors, and to respond appropriately to changes in routine work setting." (Tr. at 395).

A state agency medical expert, Jeanine Kwun, M.D., prepared a Physical Residual Functional Capacity Assessment at the same time as Dr. Miller's evaluation. Dr. Kwun considered whether Plaintiff had any physical limitations due to her diabetes, back pain, hypertension headaches, or ovarian cysts. (Tr. at 385-392). Dr. Kwun referred to Dr. Dibble's findings that Plaintiff had no tenderness in her back or loss of muscle strength, and that she was able to walk normally, to explain her reasoning in placing only minor limitations on Nickerson's exertional capabilities. (Tr. at 386, 392). Dr. Kwun found no evidence that any other physical condition caused further limitations. (Tr. at 392). Because there was no evidence that Plaintiff had any physical limitations other than those outlined by Dr. Dibble, Dr. Kwun concluded that Nickerson could lift items weighing twenty pounds occasionally, and could lift items weighing ten pounds frequently. (Tr. at 386). Nickerson could

18

stand and walk for six hours in a regular work day, and could tolerate sitting for the same amount of time. (Tr. at 386). Dr. Kwun found no other limitations on Plaintiff's physical functional capacity. (Tr. at 390).

Nickerson met with Leon Trimmingham, instead of Ms. Vallesteros, on November 1, 2012. (Tr. at 4548). Plaintiff told him that her crying spells, anxiety, anger, and hallucinations had decreased, but she still felt helpless, and continued to have mood swings and lacked motivation. (Tr. at 458). Mr. Trimmingham offered her strategies for coping with those symptoms, and stressed the importance of telling her medical providers about her symptoms. (Tr. at 458). Plaintiff missed appointments with Mr. Trimmingham on November 6 and 13, 2012. (Tr. at 456-457). When she returned on November 19, 2012, she said that she was "extremely sad," because people she loved had just "disappeared," and she blamed a family emergency for having missed the appointments. (Tr. at 454). Nickerson told him that she was under stress, because she was not receiving disability benefits, and she was worried about her ovarian cysts. (Tr. at 454). She also claimed that she had heard voices the month before and the voices said, "they don't love you, come to me." (Tr. at 454). Despite these voices, she was not considering suicide. (Tr. at 454). She told Mr. Trimmingham that she did not want to resume using cocaine or marijuana, because she did not want to return to jail. (Tr. at 454).

Mr. Trimmingham met with her the next day, on November 20, 2012, at her home. (Tr. at 453). Plaintiff told him that she was having a hard time, because her uncle had just died, and her younger sister had suffered a stroke two days earlier. (Tr. at 453). Mr. Trimmingham noted that Plaintiff appeared to be crying at the outset of the session, but her mood improved during his visit. (Tr. at 453). The session focused on identifying coping skills and recognizing when to use them.

(Tr. at 453).   On November 26, 2012, Plaintiff was seen in the offices of the NWCSC by Mr. Trimmingham and a medical team.  Plaintiff complained that she felt as if she was a burden on her family, and was considering a voluntary psychiatric hospitalization.  (Tr. at 452).  She again mentioned her uncle's death, and her sister's stroke as sources of stress, and said that she had recently witnessed an "exorcism."  (Tr. at 452).  She admitted that she argues with others for no apparent reason, and felt as if she was losing control.   However, she was not harboring suicidal thoughts. (Tr. at 452). Later that day, Mr. Trimmingham went to her home for a scheduled session, but she was not there, and did not return his phone calls (Tr. at 451).

Plaintiff met with Mr. Trimmingham on December 3, 2012.  (Tr. at 450).  She said that she was taking walks to help her manage her depression, and that the dosage of her medicines had been increased.  (Tr. at 450).  Mr. Trimmingham accepted this as evidence that Plaintiff was following her treatment plan, and that she was progressing toward her goal of managing her depression.  (Tr. at 450).  She told Mr. Trimmingham that she was feeling better than she had in a long time, and she had not had any hallucinations in while.  (Tr. at 450).  She was similarly upbeat during her December 13, 2012 visit with Mr. Trimmingham.  (Tr. at 449).  On that date, she said that she was attending church more often, taking her medication regularly, and was certain she could pass a drug test.  (Tr. at 449).  On December 17, 2012, Mr. Trimmingham again reported that Plaintiff was progressing in her treatment, and that she was taking specific steps to address her depression to prevent decompensation.  (Tr. at 529).

Nickerson went to the Settegast Clinic on December 10, 2012, for a regular checkup with Dr. Ronald Winters.  (Tr. at 580).  She reported abdominal pain which had worsened over the last nine months, and Dr. Winters requested a CT scan.  (Tr. at 580, 583).  She told Dr. Winters that she

occasionally experienced dizziness, and also had pain in the joints of her hips and knees. (Tr. at 580). Her blood sugar level was high. (Tr. at 582). She returned on January 9, 2013, complaining of left leg pain, that she said began on December 25, 2012, and had become increasingly worse. (Tr. at 574). She also complained of abdominal and lower back pain. (Tr. at 575). Although her lower back was tender to the touch, a straight leg test to evaluate whether she had a disc herniation present was negative. (Tr. at 576). Blood tests showed that she had elevated blood sugar levels, so Dr. Winters told her to record her blood sugar levels at home and bring those results to the next appointment. (Tr. at 578).

On January 24, 2013, Charles Lankford, Ph.D, a psychologist working on behalf of the state, assessed Plaintiff's condition as part of the reconsideration of her claim for benefits. (Tr. at 481). Dr. Lankford reviewed the October 15, 2012 opinions and reports from Dr. Cate Miller. (Tr. at 481, 483). He agreed with Dr. Miller's conclusion that Plaintiff's depression did not meet the diagnostic criteria for disability. (Tr. at 481). He also agreed with the limitations that Dr. Miller listed. (Tr. at 483). Laurence Ligon, M.D., a family practice doctor, reviewed Dr. Janie Kwun's report describing Plaintiff's residual functional capacity, and agreed with these conclusions. (Tr. at 482).

Plaintiff met with Mr. Trimmingham on February 1, 2013. (Tr. at 528). She reported that she was still doing well, with fewer symptoms and no thoughts of suicide. (Tr. at 528). Nickerson also said that she was losing her temper less often. (Tr. at 528). She said that she was struggling with low self esteem, and they discussed ways to address that symptom. (Tr. at 528).

On February 8, 2013, Plaintiff saw Dr. Raza as part of her psychiatric treatment. (Tr. at 523). Nickerson said that she was doing well taking and Celexa and Trazodone, but had stopped taking Risperdal because it made her nauseated. (Tr. at 523). Dr. Raza found Plaintiff to be co-operative

and goal directed, with a logical thought process and fair insight and judgment.  (Tr. at 524-525).

Plaintiff did not have hallucinations or suicidal thoughts.  (Tr. at 524).  Blood tests showed that she

had elevated blood sugar levels, but there was no evidence of illegal drug use.   (Tr. at 525).  Dr.

Raza prescribed Celexa, Trazodone, and Abilify.  (Tr. at 526).

Plaintiff continued her treatment sessions with Mr. Trimmingham on February 15, 2013.  (Tr.

at 552).  At that time, Nickerson was worried about the results of her appeal for social security

benefits, and was no longer exploring any alternative community resources while the appeal was

pending.  (Tr. at 552).  Mr. Trimmingham reported that Plaintiff had stopped progressing, because

she was no longer making an effort to seek out sources of assistance, but instead relied on her

mother to set up necessary appointments. (Tr. at 552).  Nickerson met with Mr. Trimmingham again

on March 8, 2013.  (Tr. at 553).  She told him that she was not able to do her skill training

assignment, because she was preparing for surgery to remove the ovarian cysts.  (Tr. at 553).  She

said that her family was supportive of her and that, overall, she was doing well.  (Tr. at 553).

Nickerson returned to Dr. Raza on April 11, 2013.  She told Dr. Raza that she had stopped

taking her medication two weeks earlier, because of the pending surgery.  (Tr. at 539).  Plaintiff said

that she was depressed and felt hopeless, and was having outbursts of anger four to five times a

week.   (Tr. at 539).   Despite the worsening of some of her symptoms, she was not having

hallucinations and was not suicidal.  (Tr. at 539).  Plaintiff told Dr. Raza that she had not used

marijuana since the previous September, but continued to have three to five alcoholic drinks a week.

(Tr. at 540, 542).

On April 11, 2013, Nickerson told Kathy Bates, who had replaced Mr. Trimmingham as her

therapist, that she was having more frequent crying spells and felt depressed nearly every day.  (Tr. at 554).  She said that she had moved into her mother's house permanently, and was in a constant bad mood.  (Tr. at 554).  Plaintiff  denied hallucinations or thoughts of suicide, but Ms. Bates reported that she had low energy, complained of pain from surgery, and responded to questions slowly.  (Tr. at 554).  Although Ms. Bates believed that Plaintiff was making progress toward the treatment plan goals, she stressed the importance of recognizing the symptoms of depression and managing those symptoms.  (Tr. at 554).  She also explained, again, the importance of maintaining her medication regimen.  (Tr. at 555).  Nickerson met with Ms. Bates again on April 18, 2013.  (Tr. at 556).  She told Ms. Bates that she was feeling more and more helpless and was not able to enjoy anything.  (Tr. at 556).  Ms. Bates noticed that Nickerson was not as well-groomed as usual, and cursed at times during the session.  (Tr. at 556).

Plaintiff was seen again by Dr. Raza on May 10, 2013.  (Tr. at 547).  She told Dr. Raza that she was forced to stop taking her medication two weeks earlier to have the surgery to remove the ovarian cysts.  (Tr. at 547).  Since stopping her medication, she was more anxious, had trouble regulating her mood, and had difficulty with sleeping.  (Tr. at 547).  Dr. Raza found Nickerson's thought process to be logical and she was goal directed, but she had limited insight and only fair judgment.  (Tr. at 548-549).  Dr. Raza continued her medications, but decreased the dosage of Celexa.  (Tr. at 550).  Nickerson met with Ms. Bates on the same day.  (Tr. at 558).  She told Ms. Bates that she was still irritable and angry, and that caused her to argue with her family.  (Tr. at 558). She also complained that she had severe abdominal pain following the surgery to remove the cysts, and she was told to seek immediate treatment.  (Tr. at 558).  Ms. Bates reviewed the symptoms of depression with Plaintiff and discussed the importance of recognizing those symptoms.  (Tr. at 558).

Because Plaintiff had stopped taking her medication, Ms. Bates met with Nickerson again, three days later, to review the importance of medication maintenance. (Tr. at 559). Ms. Bates' progress note show that Plaintiff had called, crying, because she was overwhelmed by daily frustrations. (Tr. at 559). When questioned, Plaintiff could only remember two of the three medications she was taking for her depression. (Tr. at 559). Despite that, Ms. Bates reported that Plaintiff was showing some progress, because she was able to explain the importance of taking her medicine. (Tr. at 559). Plaintiff next met with Ms. Bates on June 3, 2013. (Tr. at 560). Ms. Bates reported her grooming and hygiene to be "untidy." (Tr. at 560). They met again the following day, to discuss the manner in which health problems can increase symptoms of depression. (Tr. at 561). Plaintiff became tearful when explaining her health issues to Ms. Bates, but was nonetheless engaged in the session. (Tr. at 561). Ms. Bates met with Nickerson for the third consecutive day on June 5, 2013, to discuss Plaintiff's anger and corresponding outbursts. (Tr. at 562). Nickerson was cooperative, but was not always logical in her reasoning, nor appropriate in her responses. (Tr. at 562).

Ms. Bates returned to Plaintiff's house to meet with her on June 12, 2013. (Tr. at 563). Plaintiff said that she was crying more, was feeling more hopeless and helpless, and had trouble concentrating. (Tr. at 563). Ms. Bates counseled Plaintiff to take her medications as prescribed. (Tr. at 563). When they met on June 17, 2013, Plaintiff was worried about a biopsy that was scheduled for the following day. (Tr. at 564). She had trouble maintaining her focus, and was tearful at times. (Tr. at 564). On July 1, 2013, Plaintiff and Ms. Bates talked about Nickerson's angry outbursts. (Tr. at 566). Ms. Bates asked her to learn the names and dosages of her medications. (Tr. at 566). On July 9, 2013, they discussed ways in which Plaintiff could acquire

the appropriate clothing for different environments as Plaintiff was unemployed.  (Tr. at 567).

Plaintiff was anxious during this session, but denied hallucinations or suicidal thoughts.  (Tr. at 567).

Nickerson went to the Settegast Clinic on July 10, 2013, to discuss the results of a biopsy from June 18, 2013.  (Tr. at 584).  She did not have any specific complaints at this visit.  (Tr. at 584-588).  On July 16, 2016, she returned to the Settegast Clinic complaining of a headache and blurred vision that had begun two weeks earlier.  (Tr. at 589).  She was diagnosed with a sinus infection and prescribed a course of antibiotics.  (Tr. at 590).

On July 19, 2013, Plaintiff met with Ms. Bates and Dr. Raza to review her mental health and intensive treatment plans.  (Tr. at 671).  Ms. Bates did not believe Plaintiff was progressing toward her goal.  (Tr. at 674).  Nickerson said that she continued to suffer from crying spells and depression.  (Tr. at 671).  She told Ms. Bates that she had not taken her medication in eight days, because she ran out of it before her second surgery.[12]  (Tr. at 671).  Ms. Bates noted that Plaintiff's dress and hygiene were below "baseline" over the previous three months, and that she continued to drink alcohol occasionally.  (Tr. at 671).

That evening, Nickerson went to the emergency room at Memorial Hermann Hospital complaining that her vision had been blurry for two weeks.  (Tr. at 594).  She told the nurse that she had been dizzy, experienced headaches, and had numbness and tingling in her left leg for the last two weeks.  (Tr. at 596).  She denied back or neck pain, and did not have any difficulty in walking, despite the complaints about her left leg.  (Tr. at 611).  Her blood sugar level was elevated, and she was given an intravenous dose of insulin.  (Tr. at 601-604).  She was discharged with instructions

---

[12]  There is no other reference to a surgery that occurred at this time.

to monitor her blood sugar levels, and to follow up with her primary care doctor.  (Tr. at 607).  She was given an information sheet that described the symptoms of high blood sugar levels, including vision changes, weakness, headaches, and numbness and tingling in the hands or feet.  (Tr. at 608-609).

On August 2, 2013, Nickerson told Ms. Bates that she was still not taking her medication because of surgery.  (Tr. at 675).  Plaintiff said that her symptoms, including crying, feeling hopeless, and difficulty with concentration, were increasing in frequency and severity.  (Tr. at 675).  She was still able to participate in the counseling session, however, and explained some steps she could take to reduce stress and avoid triggering her symptoms.  (Tr. at 675).  On August 9, 2013, Dr. Raza reported that Plaintiff had a good attention span, with a logical thought process and fair judgment, but only limited insight.  (Tr. at 677-678).  Dr. Raza renewed the prescriptions for Celexa, Trazodone, and Abilify and counseled Plaintiff on the importance of taking her medication.  (Tr. at 679).  Despite this, on September 3, 2013, Ms. Bates wrote that Nickerson was "not taking meds as prescribed."  (Tr. at 683).

Ms. Bates again reported, on September 9th and September 12, 2013, that Plaintiff was not taking medications as prescribed.  (Tr. at 686, 687).  On both occasions, Ms. Bates wrote that Plaintiff was not suicidal, and was able to participate in the counseling session.  (Tr. at 686, 687).  Nickerson was evaluated by Camille Hewitt, a licensed professional counselor, on September 10, 2013, and she was given a GAF score of 55.  (Tr. at 685).

On September 20, 2013, Plaintiff was seen at the emergency room at Memorial Hermann Northwest Hospital.  (Tr. at 624).  She said that her blood sugar level was high, and she was dizzy and shaky, had a headache, and was blind in both eyes.  (Tr. at 624).  She was given insulin, and was

26

discharged when her condition stabilized.  (Tr. at 639-640).  Five days later, she saw Dr. Min Zhong, instead of Dr. Raza, at HCMH.  (Tr. at 688).  Plaintiff told Dr. Zhong that she wanted the Trazodone dosage increased, because she was still experiencing mood swings.  (Tr. at 688).  She denied hallucinations or thoughts of suicide at this visit.  (Tr. at 688).  Dr. Zhong found her judgment and insight to be fair.  (Tr. at 690).  He increased the Trazodone and Celexa dosages.  (Tr. at 691).

### Educational Background, Work History, and Present Age

At the time of the hearing, Nickerson was 45 years old.  (Tr. at 664, 28).  She had completed the tenth grade of high school, but then dropped out.  (Tr. at 266).  She has very little work experience, and has never earned more than $1,200.00 in a year, with prior jobs in a warehouse, as a security officer, a home health aid worker, and in a restaurant.  (Tr. at 135-136, 32, 264).  Her lifetime earnings total just $5,643.29.  (Tr. at 135).  Nickerson claims that her criminal history impacts her ability to work, both because she cannot obtain a job, and because once employed, she is worried about co-workers finding out about her past.  (Tr. at 264).

### Subjective Complaints

Nickerson claims that she has been unable to work since May 6, 2011, due to back pain, mental problems, diabetes, and hypertension.  (Tr. at 11).  She testified that one of her doctors told her that she has torn ligaments in her left leg which causes swelling.  (Tr. at 34).  She suffers from diabetes and high blood pressure, but she acknowledged that both conditions are controlled by medication.  (Tr. at 35).  She told the ALJ that she has blurry vision and needs glasses, but conceded that she has not gone to an eye doctor.  (Tr. at 36).  She testified that she first used marijuana and alcohol when she was a teenager, and that she smoked and drank almost every day for ten years. (Tr. at 36-37).  At the time of the hearing, she said that she had stopped drinking five years earlier,

and had not used any drugs in ten years.  (Tr. at 37-38).

Plaintiff described some of the symptoms and limitations she experiences due to her depression and long use of alcohol and drugs.   She testified that she has difficulty in remembering things, and struggles to get along with others.  (Tr. at 39).  She frequently gets angry at others, but is unable to explain her anger.  (Tr. at 40).  She recalled an instance when she was fired from a job for fighting with her coworkers, but she could not remember when that occurred.  (Tr. at 40). Plaintiff denied any improvement in her cognitive abilities after she stopped using drugs and alcohol. (Tr. at 38).

Nickerson testified at the hearing that she sleeps only about six hours at night, but that she also naps for an hour during each day.  (Tr. at 44).  She said that she feels more stable when she takes her medications.  (Tr. at 43-44).  She told the ALJ that she still hears voices, and that she gets confused very easily.  (Tr. at 44-45).  As an example, she explained that if she had to make a sandwich for lunch, she gets confused and frustrated and has to ask her mother to make it for her. (Tr. at 45-46).

She does not believe she is capable of work.  (Tr. at 40).  She told the ALJ that she is barely able to walk because of the torn ligaments in her leg.  (Tr. at 40).  She said that she has trouble maintaining her balance because of her leg injury and her blurry vision.  (Tr. at 41).  She said that she also has difficulty in understanding instructions.  (Tr. at 42).

### Expert Testimony

The ALJ also heard testimony from Sheryl Lynn Swisher ("Ms. Swisher"), a vocational expert.  (Tr. at 50-62).  Ms. Swisher was asked the following hypothetical question:

"Assume a hypothetical individual with the following limitations:  Light work; work is limited to simple, routine, repetitive tasks; performed in a work environment free

of fast-paced production requirements involving only simple work related decisions with few, if any, work place changes; only occasional interaction with the public and with coworkers.   Would there be any competitive employment for such an individual?"

Ms. Swisher testified that a person with those stated limitations could work as an office cleaner, a mail clerk, or a housekeeper.  (Tr. at 49).  Each of these positions are considered to be light duty, unskilled jobs, which are available in significant numbers in the local and national economies.  (Tr. at 49).  Ms. Swisher was then asked to consider a person with all of those same limitations, and an additional requirement of close supervision, "which is defined as having a supervisor check their work at least four times a day."  (Tr. at 50).  Ms. Swisher clarified the difference between a supervisor who is "just checking the work," and a supervisor who is "redirecting and prompting" the employee because she may be "off task."  (Tr. at 50).  If a worker needs constant redirection and prompting, that person is not able to perform competitive work.  (Tr. at 50, 52).  If such a hypothetical worker required only a supervisor to check the work, she would be able to do the jobs Ms. Swisher had listed previously.  (Tr. at 50).

### The ALJ's Decision

Following the hearing, the ALJ made his written findings on the evidence.  From his review of the record, he determined that Nickerson was suffering from low back problems, obesity, a major depressive disorder, and polysubstance abuse, and that those impairments were severe. (Tr. at 11). He also concluded that Plaintiff's diabetes and hypertension were non-severe impairments, because those conditions were controlled with medication.  (Tr. at 12).  He also considered Plaintiff's complaints regarding her left leg, and determined that it was not a severe impairment.  (Tr. at 12). Although Nickerson had complained of numbness and tingling in her left leg while at the Memorial Hermann emergency room, it did not affect her ability to walk, there was no clinical or diagnostic

evidence supporting her claim, and it was a new complaint that had not lasted a year, and was not expected to last a year. (Tr. at 12, 611). The ALJ similarly concluded that Plaintiff's blurry vision was not a severe impairment, because there was no evidence that she was blind, and she had not seen an optometrist for an eye examination. (Tr. at 12) The ALJ next decided that Plaintiff's impairments do not meet, or equal in severity, the medical criteria for any disabling impairment in the applicable SSA regulations. (*Id*.). In assessing Plaintiff's residual functional capacity, the ALJ determined that Nickerson is capable of performing light work, but that any position should be limited to simple, routine, repetitive work with no more than three step instructions. (Tr. at 14-15). He found that Plaintiff needs a work environment that is free of fast-paced production requirements or workplace changes, with a supervisor who can check her work four times a day. (Tr. at 15). The ALJ concluded that, while Plaintiff's impairments could reasonably be expected to cause her symptoms, her testimony regarding the intensity, persistence, and limiting effects of these symptoms is "not entirely credible." (Tr. at 16). Based on the medical records and the testimony from Ms. Swisher, the ALJ found that Nickerson is capable of working as an office cleaner, a mail clerk, or a housekeeper. (Tr. at 18). For that reason, the ALJ concluded that Plaintiff is "not [] under a disability, as defined in the Social Security Act," and he denied her application for benefits. (Tr. at 19).

Nickerson complains here that the ALJ erred because he applied the wrong legal standard to evaluate  the credibility of her subjective complaints. (Plaintiff's Motion at 18)("Plaintiff contends that the ALJ erred by evaluating Plaintiff's credibility in accordance with a rescinded SSR ruling . . . "). Nickerson argues that this error was compounded, because the ALJ discounted her testimony about the severity of her symptoms, which caused him to reach a conclusion that is not

supported by substantial evidence.  (*Id.* at 6-18).  In response, the Commissioner contends that the ALJ's decision is supported at each step of his evaluation by substantial evidence, and should be affirmed.  (Defendant's Motion at 4).

In arguing that the ALJ applied the wrong legal standard, Nickerson points to the ALJ's statement that he "considered the credibility of Plaintiff's symptoms based on the requirements of 20 CFR 416.929 and Social Security Rulings (SSR) 96-4P and 96-7P."  (Plaintiff's Motion at 6).  Plaintiff contends that SSR 96-7p was rescinded and has been replaced by a different Social Security Ruling.  (*Id.*).  Because of that, Plaintiff maintains the ALJ erroneously decided her subjective complaints were not credible.

The ALJ issued his decision on March 11, 2014.  (Tr. at 19).  On that date, SSR 96-7P was still in effect.[13]  *See, Social Security Ruling 96-07P* at  https://ww.ssa.gov/OP_Home/rulings/ di/SSR96-07-di-01.html (noting effective date of September 2, 1996; it was superseded by SSR 16-3P, effective March 28, 2016).  For that reason, the ALJ did not err in applying the standards of SSR 96-7P in assessing Plaintiff's credibility.

### The ALJ's Credibility Determination

It appears that Plaintiff's actual complaint is that the ALJ did not find her testimony on the severity of her symptoms to be entirely credible and so he found against her.  (Plaintiff's Motion at 6-18).  Nickerson contends that, "had the ALJ properly evaluated Plaintiff's subjective symptoms," he would have found her to be disabled.  (Plaintiff's Motion at 18).  The crux of Plaintiff's argument is her insistence that there is no substantial evidence to support the ALJ's decision.  (Tr. at 17-18).

---

[13]  The Fifth Circuit has made clear that "[t]he Social Security Administration's rulings are not binding on this court."  *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001).  Nevertheless, such rulings "may be consulted when the statute at issue provides little guidance."  *Id.* (citing *B.B. ex. rel. A.L.B. v. Schweiker*, 643 F.2d 1069, 1071 (5th Cir. 1981)).

In any disability determination, the ALJ "must consider a claimant's subjective symptoms as well as objective medical evidence." *Wingo v. Bowen*, 852 F.2d 827, 830 (5th Cir. 1988). However, there is no question that an ALJ has discretion to weigh the credibility of the testimony presented, and that his judgment on what weight to ascribe to it is entitled to considerable deference. *See Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990); *Hollis v. Bowen*, 837 F.2d 1378, 1385 (5th Cir. 1988). In fact, an ALJ is free to accept or reject a claimant's subjective statements, so long as the reasons for doing so are made clear. *See Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994); *Hollis*, 837 F.2d at 1385; SOCIAL SECURITY RULING ("SSR") 96–7p, 1996 SSR LEXIS 4, at *2–4.

In this case, Plaintiff complains that the ALJ did not give sufficient weight to her testimony that her back and leg pain, and her psychiatric problems, are disabling. (Plaintiff's Motion at 9, 13) (Plaintiff arguing that "there is objective evidence supporting Plaintiff's alleged symptoms in her legs"; "there is no substantial evidence to support the ALJ's conclusion that 'In terms of mental problems, the evidence as a whole is inconsistent with the severity of symptoms alleged.'"). However, it is clear that the ALJ considered Plaintiff's testimony on each of these points in forming his decision, and that there is substantial evidence to support that decision.

### Plaintiff's Back Pain and Left Leg

Plaintiff complains of lower back pain, and told the ALJ that she has torn ligaments in her left leg. (Tr. at 34). During the consulting examination, Nickerson told Dr. Dibble that she has had back pain for more than 23 years, and that it affects her ability to walk or do housework. (Tr. at 363). Although Plaintiff told Dr. Dibble that this back pain was severe, she did not appear to be in pain and she was able to walk without difficulty during his examination. (Tr. at 364-365). Dr. Dibble found no objective evidence of any impaired mobility or neurologic impairment in her back

or leg. (Tr. at 365). The ALJ considered Plaintiff's testimony, and concluded "that if the claimant's physical conditions were more severe, then she would have sought a regular course of treatment and clinical evaluation would reflect severe abnormality, as would diagnostic tests." (Tr. at 16).

During the hearing, Plaintiff explained the significance and severity of her left leg symptoms. Plaintiff told the State's consulting examiner, Dr. Dibble, that her back pain radiated to both ankles, and she complained of numbness and tingling in her left leg while in the emergency room at Memorial Hermann Hospital. (Tr. at 364, 596). Nickerson then told the ALJ that she can "hardly walk," because of torn ligaments in her leg, and that this condition was a significant reason that she is unable to work. (Tr. at 40-41). The ALJ considered this testimony, and pointed out that, when Plaintiff reported this problem to Dr. Dibble, she was observed to walk normally. (Tr. at 12). The ALJ remarked that the numbness was a new symptom, that there was no treatment record for it, and there was no clinical evidence to support this recent complaint. (Tr. at 12). From this, the ALJ concluded that Plaintiff's leg pain and numbness were not severe impairments. (Tr. at 12).

Plaintiff argues that there is an X-ray showing a structural defect in her lower back that could cause pain or numbness. (Plaintiff's Motion at 8-9, Tr. at 12). That, however, is not evidence that Plaintiff's leg and back problems are as severe as she claims, when there is no evidence that the defect is actually causing the pain or numbness. There is no medical opinion suggesting that the "structural defect" is likely to be the cause of Plaintiff's leg numbness, tingling, or pain. At the same visit at which the condition was discovered, Plaintiff was able to walk without assistance, had a normal gait, and had normal muscle strength in her legs, with no tenderness at any location on her back. (Tr. at 364). In this case, the ALJ considered Plaintiff's testimony regarding the severity of her back and leg pain, and weighed it against the absence of treatment, the lack of diagnostic or

clinical findings supporting or explaining the complaints, and the evidence that there was little or no impact on her ability to walk.  (Tr. at 12).  On these facts, the ALJ decided that Plaintiff's subjective complaints of back pain, leg pain, and numbness, which she said affected her ability to walk or work, were not entirely credible.  He determined it was not a severe impairment, and that decision is supported by substantial evidence.

### Plaintiff's Mental Impairment

Nickerson's final complaint is that the ALJ did not find her major depressive disorder and polysubstance abuse to meet or equal the severity of one of the listed impairments.  (Plaintiff's Motion at 11).  Throughout her motion, Plaintiff contests a number of statements that the ALJ made in his decision to explain his conclusion, and contrasts them with evidence favorable to her in the treatment records.  (Plaintiff's Motion at 11-18).  In doing so, Plaintiff insists, not only that there is no evidence to support the ALJ's opinion that her mental problems are not as severe as she alleges, but also that the evidence does in fact prove that she is disabled. (*Id.*).  Although Plaintiff invites the court to re-weigh the evidence in her favor on this issue, the court may only "scrutinize the record to determine whether it contains substantial evidence to support the Commissioner's decision." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).

At step three of the five-step sequential evaluation process, the ALJ concluded that the claimant's impairment or combination of impairments do not meet or medically equal the criteria of any impairment listed in the appendix to the Social Security Regulations.  A claimant is deemed to be disabled conclusively if her impairments meet, or equal in severity, an impairment that is listed in the appendix to the Social Security regulations.  *Sullivan v. Zebley,* 493 U.S. 521525 (1990); *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994); *Crouchet v. Sullivan*, 885 F.2d 202, 206 (5th Cir.

1989).  Plaintiff argues that the evidence shows that she did meet the criteria for Listing 12.04 of the

Act, which describes affective disorders.  (Plaintiff's Motion at 14-15).  Listing 12.04 describes the

criteria that must be met for an affective disorder to be considered disabling.  20 C.F.R. Pt. 404,

Subpt. P, App. 1, § 12.04 (2016).  Listing 12.04 includes three paragraphs (labeled A, B, and C)

describing the medical findings and impairment-related functional findings needed to meet the

criteria.  *Id*. at 12.00 A.   "The required level of severity for this disorder is met when the

requirements in both A and B are satisfied, or when the requirements in C are satisfied."  *Id*.

Paragraph A requires medically documented persistence of at least four depressive symptoms

including:

> 1) pervasive loss of interest in almost all activities;
> 2) appetite disturbance with change in weight;
> 3) sleep disturbance;
> 4) psychomotor agitation[14] or retardation;
> 5) decreased energy;
> 6)  feeling of guilt or worthlessness;
> 7)  difficulty concentrating or thinking;
> 8)  thoughts of suicide;
> 9)  hallucination, delusions, or paranoid thinking.

*Id.*  Those symptoms must result in two of the following functional restrictions from Paragraph B:

> 1)  Marked restrictions of activities of daily living;
> 2)  Marked difficulties in maintaining social functioning;
> 3)  Marked difficulties in maintaining concentration, persistence, or pace;
> 4)  Repeated episodes of decompensation, each of extended duration.

*Id.* at 12.04(B).  Alternatively, Paragraph C criteria are met when it is shown that the chronic

affective disorder has "caused more than a minimal limitation of ability to do basic work activities,"

and there been been repeated episodes of decompensation, evidence that even a minimal increase

---

[14]  Psychomotor agitation is the unintentional and purposeless physical motion associated with depression, and psychomotor retardation is a slowing of motor activity related to a state of severe depression.  (MOSBY'S at 1348).

in mental demands or change in the environment would cause decompensation, or she is not able to live outside a highly supportive living arrangement.  *Id.* at 12.04(C).

The ALJ examined the criteria of Listing 12.04[15] and applied those to Plaintiff's history.  (Tr. at 13).  As part of his consideration of the Paragraph B criteria, the ALJ found only mild restrictions on Nickerson's activities of daily living, resulting from her mood disorder and depression.  (Tr. at 13).  He pointed to her statements that she could cook, clean and shop.  (Tr. at 13).  He also noted her ability to take care of personal needs and use public transportation.  (Tr. at 13).  He then considered the level of Plaintiff's social functioning.  (Tr. at 13).  Although Plaintiff has been incarcerated for assault,[16] and she described difficulty in getting along with co-workers, she also attends church, has made friends at church, and has a good relationship with her daughter and extended family members.  (Tr. at 13-14).  This, the ALJ found, was evidence of moderate, rather than marked or extreme limitations.  (Tr. at 14).

The ALJ also found Plaintiff to have only moderate limitations in her concentration, persistence, and pace.  (Tr. at 14).  Plaintiff showed good concentration and attention during her counseling sessions in 2013.  (Tr. at 14).  The ALJ also observed that Plaintiff did not fully participate in the psychological consulting examination.[17]  (Tr. at 14).  The ALJ concluded that

---

[15]  The ALJ also considered Plaintiff's Substance Addiction Disorder under Listing 12.09.  (Tr. at 13).  The criteria for depressive syndrome caused by substance addiction is evaluated under the criteria for Listing 12.04.  (12.09).  Because of that, the ALJ's assessment of Plaintiff's depressive disorder under Listing 12.04 applies to his assessment of her substance abuse disorder.

[16]  Plaintiff was incarcerated in the 1980's, in 1999, and in 2009.  (Tr. at 264, 294).  These incarcerations predate the onset date of her alleged disability.

[17]  The ALJ referred to Dr. Gamez-Galka's report as the basis for this opinion.  (Tr. at 264-272).  Dr. Gamez-Galka did not question Plaintiff's effort and said that her "concentration, persistence, and pace" were satisfactory.  Dr. Gamez-Galka declined to make a diagnosis because Plaintiff's description of her symptoms and history was inconsistent, and statements that she made at the beginning of the examination were contradicted by statements made at the end.  Dr. Gamez-Galka also documented Plaintiff's wrong answers to the math questions.

Plaintiff did not show the level of cognitive impairment that would be expected for marked or extreme limitations, even though she was not able to understand or carry out complex tasks.  (Tr. at 14).  The ALJ's determination that Plaintiff has, at most, moderate limitations in these categories is supported by substantial evidence.

Plaintiff argues that there is evidence of repeated psychiatric hospitalizations, and because of that, the ALJ erred when he determined that she has not suffered multiple events of decompensation.  (Plaintiff's Motion at 14).  Repeated episodes of decompensation refers to "three episodes within 1 year . . . each lasting for at least two weeks."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(4).  Plaintiff cited four hospitalizations, two of which took place in 2005, one in 2010, and one in 2012.  Since these four hospitalizations occurred over a span of seven years, not within one year, they are not evidence that Plaintiff has had repeated episodes of decompensation for purposes of the Act.  The ALJ's conclusion that Plaintiff does not satisfy Listing 12.04(B) is supported by substantial evidence.

The ALJ also discussed whether Plaintiff met the criteria set out in paragraph C of Listing 12.04.  In light of the evidence that Plaintiff had only mild or moderate restrictions because of her mental impairments, the ALJ concluded that she did not require a highly supportive living arrangement, nor would she decompensate if there was slight increase in mental demands or a change in her environment.  (Tr. at 14).  Because of that, Nickerson did not satisfy the criteria of paragraph C.  The ALJ has detailed sufficient evidence to support his decision on this issue.

_____

(Tr. at 267-268) ("She stated 5+4 was 2, 3x5 was 10, and 10+6 was 17.  When asked 100-3, she said it was 2.  When asked if you subtract 3 from 2, she stated it was 0 and 3 from 0 was 1.").  Her responses to questions on current events were similarly wrong.  *(Id.)*  ("She indicated the president was a cowboy, and later stated it was Arnold Schwarzanegger, the governor was Bill Clinton, and the mayor was Don King.").  The ALJ believed these answers and inconsistencies in her symptoms was evidence of an ability to exaggerate symptoms for purposes of secondary gain.  (Tr. at 14).

More broadly, Plaintiff insists that there is no substantial evidence to support the ALJ's decision that she is not impaired. (Plaintiff's Motion at 13, 18). Plaintiff points to her history of suicide attempts, multiple arrests, and psychiatric hospitalizations as proof that she is disabled. (Plaintiff's Motion at 12). She argues that these episodes show that her symptoms, including suicidal thoughts and difficulty in controlling her anger, are more severe than the ALJ acknowledged. (Tr. at 13). She further insists that the repeated GAF scores of 45 or below are evidence of "serious symptoms," and point to an inability to maintain employment. (Plaintiff's Motion at 13).          However, the ALJ did consider all of that evidence in discussing the credibility of Plaintiff's complaints, and her claim that she is unable to work. (Tr. at 15-18). The ALJ contrasted Nickerson's testimony about the severity of her depressive symptoms and hallucinations with the evidence that he believed proves her mental issues are not as significant as alleged.   The ALJ described Plaintiff's lengthy history of alcohol and drug abuse and her inconsistent statements about whether she continued to use drugs and alcohol.   He found that Plaintiff's substance abuse contributed significantly to her symptoms. (Tr. at 16). For example, the ALJ noted that Nickerson's hospitalization in 2010, was due to an alcohol induced mood disorder, and that drug testing revealed that she had continued to use marijuana through 2012. (Tr. at 16, 204, 540).   When Plaintiff was admitted to the hospital for psychiatric treatment in August 2012, she admitted to having used alcohol and marijuana the day before. (Tr. 17, 284). The ALJ also discussed Plaintiff's treatment and her response to that treatment. (Tr. at 16-17). The ALJ pointed out that, more than once, Plaintiff had reported that her depressive symptoms improved significantly when she took her medication. (Tr. at 16). He emphasized that she showed rapid improvement in her symptoms when she received treatment and resumed taking her medication during the August

2012 hospitalization, and that the hospitalization was triggered by her failure to take her medicine. (Tr. at 16-17).  The ALJ underscored Plaintiff's failure to keep counseling sessions, as well as the numerous instances in which she discontinued her medication, or was only partially compliant with the recommended treatment.  (Tr. at 16).  He found that her continued noncompliance with treatment often precipitated exacerbation of her symptoms, and that she was much improved when she followed the recommended treatment regimen.  (Tr. at 17).  He found further that her noncompliance caused her greater complications than her alcoholism.  (Tr. at 17).  When Plaintiff complied with her treatment plan and took her medication, her suicidal thoughts and hallucinations ceased.  (Tr. at 452, 524, 552-590).  Because of that, he concluded that if her symptoms were as severe as alleged, she would have followed the prescribed treatment regimen.  (Tr. at 17).

The ALJ then turned to the medical opinions expressed in her records as further support for his decision.  He points out that no treating medical source has expressed the opinion that Plaintiff is disabled, or offered any limitations.  (Tr. at 17).  The ALJ found the opinions from the consulting examiners and state agency consultants to be consistent with the evidence as a whole, and this corroborated his conclusion that Plaintiff has only moderate limitations.  (Tr. at 17).  He acknowledged Plaintiff's low GAF scores, but did not find them be persuasive, as they were based on Nickerson's subjective complaints, which the ALJ had already found less than fully credible. (Tr. at 17).  He also explained that GAF scores were not used to determine functional limitations under the rules in place at the time of his decision.  (Tr. at 17-18).

Here, it is clear that the ALJ considered both the subjective and objective evidence in assessing Plaintiff's credibility and her complaints.  *See Wingo*, 852 F.2d at 830.  In questioning Plaintiff's credibility, he made specific references to the objective medical evidence to do so.  *See*

*Falco*, 27 F.3d at 164; *Hollis*, 837 F.2d at 1385; SSR 96–7p.  As a result, the ALJ complied with the law in assessing Nickerson's credibility, and his decision is entitled to considerable deference on that issue.  *See Villa*, 895 F.2d at 1024; *Hollis*, 837 F.2d at 1385.  The ALJ also described the medical evidence and opinions supporting each step of his evaluation of Plaintiff's claim.  There is substantial evidence to support the ALJ's decision at each step of the five step analysis.  As a result, his decision need not be disturbed. *See Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452. For these reasons, Defendant's motion for summary judgment is  granted, and Plaintiff's motion is denied.

### *Conclusion*

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment is **GRANTED**, and that Plaintiff's motion for summary judgment is **DENIED**.

**SIGNED** at Houston, Texas, this 24th day of March, 2017.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**

40